UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
E.T. and D.T., on behalf of their minor child,  :
E.T.,  :
  :
                Plaintiffs,  :
  :
      - against -  :
  :        <u>**OPINION AND ORDER**</u>
THE BOARD OF EDUCATION OF THE  :
PINE BUSH CENTRAL SCHOOL DISTRICT,  :        11-CV-5510 (ER)
  :
              Defendant.  :
  :
-------------------------------------------------------------x

<u>Appearances:</u>

Michael H. Sussman
Sussman & Watkins
Goshen, New York
*Attorney for Plaintiffs*

Daniel Petigrow
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, New York
*Attorney for Defendant*

<u>Ramos, D.J.:</u>

      E.T. and D.T. (the "parents" or "Plaintiffs") are the parents of a disabled child ("E.T.") as

defined in the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §

1400 *et seq.* The parents reside within the Pine Bush Central School District (the "district" or

"Pine Bush"). The parents unilaterally placed E.T. in the Ridge School, a private school located

within the Hyde Park Central School District ("Hyde Park") for the 2010-2011 school year and

sought tuition reimbursement from the district under the IDEA. The parents' claim was heard by

an Impartial Hearing Officer ("IHO"), who conducted a four-day due process hearing. On

January 18, 2011, the IHO found that the district had no obligation to provide E.T. with a free

appropriate public education (a "FAPE") because the parents had made clear their intention to enroll E.T. at the Ridge School prior to giving the district an opportunity to prepare an Individualized Education Program ("IEP") for E.T. for the 2010-2011 year.   The IHO thus concluded that the district was not responsible for tuition reimbursement to the parents for that year.   The parents appealed to a State Review Officer ("SRO"), who affirmed the IHO in a decision dated April 11, 2011. The parents then brought suit in this Court seeking review of the SRO's decision and now move for summary judgment.   The Defendant has cross-moved for summary judgment.   For the reasons set forth below, Plaintiffs' motion and Defendant's cross motion are denied without prejudice and the Court orders the case to be stayed and remanded to the SRO for further findings.   *See Nichols v. Prudential Ins. Co. of Am.,* 406 F.3d 98 (2d Cir. 2005) (discussing district court's ability to remand issues to an administrative agency); *Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 318 (S.D.N.Y. 2005); *Maine Sch. Admin. Dist. No. 35 v. Mr. R.*, 321 F.3d 9, 20 (1st Cir. 2003).

## I.      Background

E.T. has attended the Ridge School ("Ridge") since the 2008-2009 school year.  Pursuant to two settlement agreements between the parents and the district, the district paid for E.T.'s tuition at Ridge for the 2008-2009 and 2009-2010 school years. The parents now seek reimbursement for the costs of E.T.'s private placement for the 2010-2011 school year.   The Court has reviewed the contents of the administrative record submitted by the parties, and draws the following facts from the parties' Local Rule 56.1 Statements, the transcript of the testimony heard by the IHO, the exhibits introduced at the hearing, the IHO's Findings of Fact and Decision of January 18, 2011, and the Decision of the SRO of April 11, 2011.

### A.  E.T.'s Educational Background

E.T. is currently seventeen years old, classified as autistic, and diagnosed with Asperger's Syndrome and school phobia.  (Joint Ex. 13 at 1.)  He was first classified with a disability and found to be eligible for special education and related services when he was in preschool.  (Tr. at 405.)   In kindergarten, he was classified by the district as a student with a speech or language impairment.  (*Id.*)  Since then, E.T. has been on various medications for his conditions.  (Joint Ex. 13 at 1.)  In the 2003-2004 school year, when E.T. was in the third grade, the district's Committee on Special Education ("CSE") classified E.T. as learning disabled.  (Joint Ex. 1 at 3; Tr. at 405.)  He maintained that classification for the 2004-2005 school year.  (Joint Ex. 2 at 1.) In April 2006, E.T. was classified as autistic.  (Tr. at 405; Joint Ex. 4 at 1.)

E.T. is cognitively of average to above average intelligence, but has significant weaknesses in reading, writing, and other tasks requiring auditory processing and memory.  (Tr. at 4-5.)  He also has difficulty in language and social skills, and can be easily frustrated by academic tasks.  (*Id.* at 5.)  Historically, he has had difficulty trusting others and experiences fear frequently based on having been mistreated and bullied by others in school.  (Joint Ex. 12 at 2.) His resultant phobia of school causes him to experience "an extreme level of fear, panic, and escape-avoidance thoughts."  (*Id.*)   E.T. also exhibits features of Asperger's Syndrome including obsessive-compulsiveness, difficulty with social and emotional expression, and resistance to change in routine and transition.  (*Id.*)

### B.  The 2005-2006 School Year

E.T. began to exhibit behavioral and social difficulty in the fall of 2005, when he was in the fifth grade at Circleville Elementary School ("Circleville").  (Parents' Ex. C.)  He was reported to have engaged in "rude, discourteous, uncooperative, and destructive behavior" and

was involved in fights with other students and staff.  (State Review Officer Decision ("SRO Dec.") at 22.)  He also reported to his mother that he was bullied by other students at Circleville. (Tr. at 409-10.)   On one occasion, after slapping his teacher's hand, attempting to throw furniture, and breaking headphones, E.T. was suspended from school for one day.  (Parents' Exs. C, H.)   On November 4, 2005, as a result of his behavior, E.T. was hospitalized for approximately six days so that his treating physicians could alter his medication.  (Parents' Ex. D; Tr. at 406-07.)  When he was released from the hospital, he returned to Circleville with a recommendation that he be placed in a classroom with a small number of students.  (Tr. at 407.)

In March 2006, E.T. began to have difficulty and became more frustrated and anxious at Circleville.  (Tr. at 408.)  He was given a one-on-one aide and a reduced schedule to meet his needs.  (*Id.*)  On March 15, 2006, E.T. was placed in an "inclusion class" with over thirty other students, which caused him to have a "major meltdown."  (*Id.* at 408-09.)  The district called emergency services and the parents, and when the parents arrived at the school he was laying on the floor of the vice principal's office crying and shaking.  (*Id.* at 409.)  After this incident, E.T. was placed on home instruction and did not return to Circleville.  (Tr. at 410.)

At the end of April 2006, on the recommendation of the district, E.T. was placed in an intensive day treatment program in Middletown, New York offered through the Board of Cooperative Educational Services ("BOCES").  (Tr. at 410; SRO Dec. at 2.)  However, on his first day there, he had a "major meltdown" several hours after arriving.  (Tr. at 410-11.)  He was then placed on home instruction for the remainder of the school year and received two hours of tutoring daily from the district.  (*Id.* at 411.)

### C.  The 2006-2007 School Year

The district offered two proposed placements for E.T. for the 2006-2007 school year—Green Chimneys and Westchester Exceptional.  (Tr. at 411-12.)    The parents visited both facilities, and found Green Chimneys to be inappropriate for E.T. because it did not have a program for students with Asperger's Syndrome.  (*Id.* at 412.)  The parents found Westchester Exceptional to be an appropriate placement, and they enrolled E.T. in that program.  (*Id.* at 412-13.)

In September 2006, on his first day at Westchester Exceptional, E.T. had another "meltdown."  (Tr. at 413.)  After staying home for a day, he returned to the school and had a "meltdown" again within several hours.  (*Id.*)   The school told his mother at that point that it was not an appropriate placement for her son, and he did not return to the school thereafter.  (*Id.* at 414.)  He was again placed on home instruction for the duration of the school year.  (*Id.*)

On November 30, 2006, at the request of the parents, the district's CSE met to review E.T.'s IEP.  (Joint Ex. 4 at 1; SRO Dec. at 3.)  E.T.'s home tutor reported that he was making "steady academic progress, ha[d] improved his frustration tolerance and [was] much more motivated in task completion."  (Joint Ex. 4 at 5.)  The CSE recommended that E.T. receive an occupational therapy evaluation, speech therapy, and multisensory reading instruction.  (*Id.*)  The CSE also provided the parents with a list of day schools approved by the state that specialized in programs for autistic students in the Hudson Valley area of New York.  (*Id.*; SRO Dec. at 3.)

After E.T. underwent the occupational therapy evaluation, the CSE reconvened on March 6, 2007 and concluded that E.T. should remain on home instruction.  (Joint Ex. 5 at 5; SRO Dec. at 3.)  While on home instruction that year, E.T.'s mother brought him to a social skills group on her own for six weeks to promote his socialization skills.  (Tr. at 414-15.)

### D.  The 2007-2008 School Year

On May 2, 2007, the CSE held a meeting to develop E.T.'s IEP for the 2007-2008 year, at which the district explained it was "imperative [to] begin to prepare [E.T.] for a transition back into a regular special education program for the 2007-08 school year."  (Joint Ex. 6 at 5.)  The CSE thus recommended providing E.T. with transitional opportunities over the summer to prepare him for reentry into a structured school program, continuing home instruction pending placement in the Asperger's Program for Independent Education ("APIE")[1] at BOCES or a similar program, and other services, such as speech-language therapy, occupational therapy, and counseling.  (*Id.*)

In the spring of 2007, the parents visited the APIE program but decided it would not meet E.T.'s needs.  (Tr. at 32-33, 415-17.)  The parents learned that there were approximately 150 students in the school—many of whom were classified as emotionally disturbed—and that it was located in a very large school building.  (*Id.* at 416-17.)  Based on an earlier diagnosis of Dr. Linda Klein ("Klein"), E.T.'s private treating psychologist, that E.T. experienced school phobia, the parents did not believe E.T. would be able to attend a school of that size.  (*Id.* at 417.)  The parents determined they would not enroll E.T. in the APIE program for the 2007-2008 school year, and he remained on home instruction for the duration of the year.  (Joint Ex. 6 at 5; Tr. at 419.)

On September 6, 2007, the CSE reconvened at the request of the parents.  (Joint Ex. 6 at 1, 5; SRO Dec. at 4.)  The CSE recommended that "[s]upported gradual attempts . . . be made to increase [E.T.'s] toleration to a school environment and to include his participation in some small group activities for added growth in social skills."  (Joint Ex. 6 at 5.)  The committee also

---

[1] The APIE program is specifically tailored to high functioning students with autism and Asperger's Syndrome. (Joint Ex. 6 at 5.)

recommended a follow-up meeting in six to ten weeks to monitor the progress of E.T.'s program. (*Id.*)  In the meantime, E.T. remained on home instruction, receiving two hours of tutoring daily and speech therapy twice a week.  (Tr. at 419.)  He also received counseling sessions with Klein pursuant to the parents' request as well as speech and occupational therapy.  (*Id.* at 420; Joint Ex. 6 at 5; SRO Dec. at 4.)

In December 2007, E.T.'s mother visited Ridge with him for the first time, which is located within the Hyde Park Central School District.  (Tr. at 423-24; Def.'s Stmt. Material Facts Pursuant to Local Rule 56.1 ("Def.'s 56.1 Stmt.") ¶ 4.)  Ridge was founded by Michael Kondor ("Kondor") in 2005 to educate students with Asperger's Syndrome.[2]  (Def.'s 56.1 Stmt. ¶ 5.) After her initial visit, E.T.'s mother requested that the district send a referral packet for E.T. to Ridge in February 2008.  (*Id.* ¶ 4; Tr. at 422.)  Pursuant to the parents' request, representatives from the district sent a referral packet and visited the program at Ridge.  (Tr. at 422-23.)  By letter dated March 13, 2008, E.T.'s mother requested that the CSE convene to discuss placing E.T. at Ridge.[3]  (Joint Ex. 22.)

During the winter of 2008, when E.T.'s mother brought him to Ridge to be evaluated, Kondor invited E.T. to join the program for weekly field trips to begin socializing with other students.  (Tr. at 424.)  E.T. agreed to go on the field trips, and one of his parents was with him on each trip he attended.  (*Id.* at 424-25.)  The total enrollment at Ridge at that time was six students, all of whom had Asperger's Syndrome and were at least 2 years older than E.T.  (*Id.* at 425-26.)

---

[2] Ridge is not approved by the State of New York for providing special education services to students with disabilities.  (Def.'s 56.1 Stmt. ¶¶ 3, 5.)  However, as discussed *infra* Part IV.A, a school's failure to comply with state educational standards, *per se*, does not violate the IDEA and tuition reimbursement may yet be available if the school is determined to be an appropriate placement for a particular child.

[3] *See infra* note 4.

### E.  The 2008-2009 School Year

The district recommended that E.T. attend the APIE program for the 2008-2009 year, and the parents signed a consent form to have a packet sent there.[4]  (Tr. at 34, 426-27.)  The parents, however, claim that they were never invited to visit the APIE program, nor did they ever receive notification as to whether E.T. had been accepted into the program for the 2008-2009 school year.  (*Id.* at 427.)  On August 13, 2008, E.T.'s mother advised the district by letter that the parents had placed him at Ridge for the 2008-2009 school year, and requested that the district pay for E.T.'s tuition to Ridge and provide transportation.  (Joint Ex. 23 at 2.)

Klein issued a report on August 28, 2008, in which she concluded that E.T. had significantly improved his ability to develop trust after having experienced bullying and mistreatment in school at a younger age.  (Joint Ex. 12 at 2.)  She reported that he had improved in his ability to adapt to change and that although he expressed fear of his previous school and the bullies there, he also expressed an interest in attending a school again to be around other students.  (*Id.*)  Klein stated that E.T. continued to experience fear of being teased and bullied by peers, but that his school phobia could be resolved "over time with intervention."  (*Id.*)  Thus, she recommended that E.T. attend an educational program that accommodates students with Asperger's Syndrome as well as his other needs so that he could gradually develop skills and emotional competence.  (*Id.*)

When E.T. began attending Ridge, there were five other students enrolled in the school.  (Tr. at 429.)  It was a very difficult transition for him at first, and his mother frequently attended the school with him as a volunteer one-on-one aide.  (*Id.* at 428-30.)  E.T. did not begin to feel comfortable with Kondor, his other teachers, or the school psychologist, Dr. Hudak ("Hudak")

---

[4] It is unclear from the administrative record whether the district's CSE met to create an IEP for E.T. for the 2008-2009 school year.  There is no IEP for 2008-2009 in the record, nor any reference to the existence of one.

until the end of the school year. (*Id.* at 428.) He also began to socialize with the other students by the end of the year, and became willing to attend school on a daily basis. (*Id.* at 428, 431.) On December 16, 2008, the district entered an agreement with the parents to pay them $30,000 for E.T.'s tuition to Ridge for the 2008-2009 school year. (Dist. Ex. 1; Tr. at 428.)

### F. The 2009-2010 School Year

On June 19, 2009, a sub-committee of the CSE of Hyde Park met to develop an Individualized Education Service Program ("IESP") for E.T. for the 2009-2010 year. (Joint. Ex. 7 at 1.) The Hyde Park CSE found that E.T. had a very successful first year at Ridge and made "remarkable improvements socially and academically," though he still exhibited difficulty with reading and writing tasks. (*Id.* at 5.) The IESP stated that E.T. had been parentally placed at the Ridge School for the 2009-2010 year, and the Hyde Park CSE made recommendations for the summer of 2009, including one-on-one home tutoring. (*Id.* at 2.) The Hyde Park CSE additionally recommended that E.T. receive a variety of services including a full-time one-on-one aide, counseling, occupational therapy, and speech-language therapy for the 2009-2010 school year at Ridge. (*Id.* at 5.)

In addition to the Hyde Park CSE meeting, Pine Bush's CSE also convened at the request of the parents to conduct E.T.'s annual review on July 9, 2009. (Joint Ex. 8 at 5.) The district's CSE noted that Hyde Park had already convened its CSE and that the parents reported E.T. had a very successful first year at Ridge. (*Id.*) Kondor reported that E.T.'s transition to Ridge had been difficult, but he became much more comfortable over the course of the year. (*Id.*) Hudak reported on E.T.'s progress and recommended that E.T. remain in a nurturing environment that would provide him with stability and opportunities for continued growth. (*Id.*) The parents

requested tutoring for E.T. at the Konsul School of Developmental Learning[5] for the summer of 2009, which the CSE denied and instead offered tutoring by district staff for six weeks in the summer months. (*Id.*)  The July 9, 2009 meeting was adjourned so that the district could obtain additional information from Hyde Park's CSE before finalizing E.T.'s IEP. (*Id.*)

The district's CSE reconvened on July 16, 2009, and recommended placement for E.T. in the APIE program at BOCES of Ulster County for the 2009-2010 school year. (Joint Ex. 8 at 1, 5.)  The parents rejected the district's recommendation and advised that they planned to send their son to Ridge for a second year. (*Id.* at 5.)  The parents also advised that they intended to seek payment from the district for E.T.'s placement. (*Id.*)  On July 16, 2009, the CSE chairperson sent a referral packet to Ulster BOCES on behalf of E.T. for admission to the APIE program, despite the parents' rejection of the district's recommendation. (Joint Ex. 17.)

On July 21, 2009, E.T.'s mother notified Hyde Park's director of special education that the parents were placing the child at Ridge for 2009-2010 and requested that Hyde Park provide "auxiliary services" to E.T. (Dist. Ex. 3.)  On August 27, 2009, the parents again advised Pine Bush that they would be placing E.T. at Ridge and that they would be seeking payment from the district for his placement there. (Joint Ex. 24.) They also stated that they had placed E.T. at the Konsul School of Developmental Learning and requested that the district fund these services, despite the fact that the district had already rejected such a placement. (*Id.*)  On September 9,

---

[5] Kondor co-founded the Konsul School of Developmental Learning approximately thirty-five years ago. (Tr. at 536.)  It is a "private remedial learning center" in Poughkeepsie, New York and serves kindergarten through twelfth grade students. (*Id.* at 536-37.)

2009, the APIE program notified the district's CSE that APIE would not proceed with E.T.'s referral.[6]  (Tr. at 35-7.)

Hudak conducted an evaluation of E.T. as part of his "three year assessment" over six separate sessions between November 16, 2009 and January 11, 2010.  (Joint Ex. 13 at 1; Joint Ex. 8 at 5.)  Hudak recommended an "integrated approach" for E.T.'s teachers and therapists to address his needs and to reduce his anxiety surrounding academics, and that his IEP test accommodations and program modifications remain in place.  (Joint Ex. 13 at 27.)  On April 29, 2010, E.T.'s parents had him undergo a private assistive technology evaluation, which recommended specific programming to assist with E.T.'s verbal and written development, and further evaluations for reading and receptive communication skills.  (Tr. at 522-23.)  E.T.'s mother provided the assistive technology evaluation to a special education coordinator at Hyde Park by letter dated May 10, 2010, and requested that E.T. receive the recommended services. (Dist. Ex. 5.)  She also requested Hyde Park's CSE to convene in order to discuss the evaluation. (*Id*.)

E.T.'s parents reported that he made significant progress in 2009-2010, his second year at Ridge.  (Tr. at 435-36.)  His mother testified that he began to read aloud in the classroom, became better able to voice his needs, and did not require as many breaks from academic work due to frustration or anxiety.  (*Id*. at 436.)

### G. The 2010-2011 School Year

Starting on or about May 18, 2010, E.T.'s mother was in contact with Rosemary Mannino ("Mannino"), Director of Secondary Special Programs, regarding the district's possible recommendations for E.T. for the 2010-2011 school year.  (Joint Ex. 25.)  The district advised

---

[6] The parents assert they never heard whether E.T. was accepted to the APIE program. (Tr. at 433-34.) The district maintains, however, that E.T. was accepted to the APIE program for the 2009-2010 school year, but because the parents were not interested in that placement, the district did not proceed with the referral. (*Id*. at 35-7.)

the parents that it was considering recommending two programs specifically for students with Asperger's Syndrome for E.T., and the parents requested information on these programs before agreeing to schedule visits to them.  (*Id*.)  On May 20, 2010, after receiving some information on both programs, the mother requested further information, including the classifications, academic levels, social skills levels, and verbal abilities of the students, class size, and student-to-staff ratio in each program. (Joint Ex. 26.)

Soon thereafter, Mannino formally recommended two programs for E.T. for the 2010-2011 school year—the APIE program at Ulster BOCES and Chester Academy at Orange-Ulster BOCES.  (Tr. at 40-42, 443.)  On May 24, 2010, Mannino sent a referral packet to the APIE program for E.T.  (Joint Ex. 19.)  E.T.'s mother provided her consent for the district to do so by email dated May 26, 2010, and stated that she intended to schedule visits to both programs. (Joint Ex. 27.)  On May 27, 2010, the parents visited the APIE program.[7]  (Joint Ex. 29.)  They found that there "was no social interaction at all among the students," which was in stark contrast to Ridge, where, according to the parents, the small environment was very helpful for E.T. to learn how to socialize with other students. (*Id*. at 445-47.)  E.T.'s mother testified that E.T. also thought the building was "too big, there would be a lot of people in it, a lot of noise and a lot of confusion."  (*Id*. at 449.)

On May 26, 2010—the same day that E.T.'s mother stated her intention to visit the BOCES programs—the mother also confirmed with Hyde Park that the parents would attend Hyde Park's CSE subcommittee meeting to be held on June 7, 2010 at Ridge.  (Dist. Ex. 4.) There is no indication in the record that she mentioned this meeting to Mannino or anyone else from Pine Bush.

---

[7] The parents also visited Chester Academy at Orange-Ulster BOCES, and concluded that it did not provide "a lot of social interaction" and was in "a wing of the high school that was very noisy."  (Tr. at 443.)  Ultimately the district agreed Chester Academy would not be an appropriate placement for E.T.  (*Id*. at 444.)

By letter dated June 2, 2010, Mannino requested that Kondor provide Pine Bush with attendance, scheduling, grades, transcripts, and Hudak's testing information for E.T., and stated that the district would set up a CSE meeting to make recommendations for the 2010-2011 school year.  (Joint Ex. 28.)

On June 7, 2010, Hyde Park held a CSE meeting to make recommendations for the 2010-2011 school year.  (Joint Ex. 9.)  Hyde Park's CSE recommended a one-on-one aide, counseling, occupational therapy, and speech therapy in E.T.'s IESP.  (*Id.*; Def.'s 56.1 Stmt. ¶ 16.)  E.T.'s mother stated at the June 7, 2010 meeting that she intended to place E.T. at Ridge for the 2010-2011 school year, but that her intent was not definite.  (Tr. at 515-16.)  As the mother testified on cross examination at the hearing before the IHO,

> Q:  Was there a discussion about where [E.T.] would be placed during the 2010-2011 school year?
>
> A:  We hadn't definitely decided if he was returning to the Ridge School or not . . . because I had to look at the programs Pine Bush recommended.
>
> Q:  But . . . did you communicate to the committee at the time that as of this meeting [E.T.] was going to be at the Ridge School at least as of this meeting?
>
> A:  Yes.

(*Id.*)

On June 14, 2010, the parents entered a settlement with the district regarding payment of tuition for the 2009-2010 year.  (Dist. Ex. 2.)  On June 23, 2010, the parents visited the APIE program with E.T. for an intake evaluation, and he was later accepted into the program. (Joint Ex. 20; Tr. at 508-09.)  There is no indication in the record that on either June 14 or June 23, 2010 the parents advised the district of the CSE meeting held in Hyde Park on June 7, 2010, despite interacting with district representatives on both dates.

On June 29, 2010, E.T.'s mother sent an email to Mannino in which she acknowledged the district's intent to transition E.T. into the APIE program for the summer.  (Joint Ex. 32.)  On July 8, 2010, the district held a CSE meeting for E.T., which recommended placing E.T. in the APIE program for the 2010-2011 school year.  (Joint Ex. 10; Tr. at 442.)  Both Kondor and Hudak were present at the CSE meeting and stated their disagreement with the recommended placement.  (Tr. at 451.)  The district's school psychologist, however, stated that based on Hudak's report that E.T. had grown significantly while at Ridge, the APIE program was an appropriate placement for him.  (*Id.* at 451-52.)  E.T.'s parents expressed concern about him transitioning from Ridge to the APIE program, and the district made suggestions as to how E.T. might ease into the program.  (Joint Ex. 10 at 5-6.)  At that point, and for the *first* time, the parents communicated to the district that Hyde Park's CSE had convened one month earlier and created an IESP for E.T., and that they intended to place E.T. at Ridge for the 2010-2011 school year.  (Joint Ex. 10 at 6.)

As the district had not been made aware of Hyde Park's IESP until the July 8, 2010 CSE meeting, the district was unable to finalize E.T.'s IEP on that date.  (Tr. at 58-60.)  In order to incorporate the goals from Hyde Park's IESP into the district's IEP and fully update his transition plan, goals and objectives, the district adjourned the July 8, 2010 meeting until it had obtained such information from Hyde Park.  (*Id.* at 59-62.)  Nevertheless, the district indicated its intention to finalize E.T.'s IEP before the start of the 2010-2011 school year.  (*Id.* at 59-60.)  The district thus proposed to reconvene the CSE meeting on August 11, 2010, but the parents advised that they were unavailable on that date.  (*Id.* at 59.)  The parents proposed several alternative dates in September—*after* the start of the school year—but the district replied it was unsuitable for the school year to begin without an IEP in place for E.T.  (*Id.*)  The district then

14

suggested that the parents participate in the CSE meeting by phone on August 11, 2010, which E.T.'s mother stated would not be possible.  (*Id.* at 60.)

Two weeks before the CSE meeting was to be held, on July 29, 2010, the district sent the parents a draft copy of E.T.'s IEP for the upcoming school year.  (Joint Ex. 40.)  The parents do not dispute that they received the draft.  However, the parents were out of town from July 30, 2010 to August 7, 2010, and never provided their input to the district.  (Joint Ex. 41; Tr. at 63.)  Rather, in an email dated August 10, 2010, E.T.'s mother insisted that the parents would not accept an IEP generated at the August 11, 2010 CSE meeting.  (Joint Ex. 41.)  Notwithstanding the parents' absence, the district held a CSE meeting on August 11, 2010 and completed E.T.'s IEP, which modified the IEP generated on July 8, 2010 with additional goals for E.T for the 2010-2011 school year.  (Joint Ex. 42; Tr. at 63-64.)  By letter dated August 27, 2010, the parents rejected the IEP developed by the district's CSE.  (Joint Ex. 43.)

## II.    Procedural History

### A.  The IHO's Decision of January 18, 2011

Pursuant to the parents' request for a due process hearing, IHO James McKeever, Esq., held four days of testimony in October 2010.[8]  (*See* Impartial Hearing Officer's Findings of Fact and Decision ("IHO Dec.") at 3-4.)  On January 18, 2011, he issued a decision denying the parents tuition reimbursement from the district and dismissed their complaint.  (*Id.* at 21.)  The IHO found that the parents had clearly stated their intention to keep E.T. enrolled at Ridge at Hyde Park's CSE meeting on June 7, 2010.  (*Id.* at 19.)  Therefore, he found that the district had

---

[8] Pursuant to 20 U.S.C. § 1415(f), a parent may challenge an IEP as insufficient through an impartial due process hearing.  *Id.*  In New York State, the local board of education must appoint an Impartial Hearing Officer to preside over the due process hearing.  *M.H. v. New York City Dept. of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (citation omitted).

no obligation to provide E.T. with a FAPE for the 2010-2011 school year.[9]   (*Id.* at 21.)  The IHO

based his decision on the U.S. Department of Education (the "DOE") guidance, which states that

> if a determination is made by the [local education agency ("LEA")] where the
> private school is located that a child needs special education and related services,
> the LEA where the child resides is responsible for making FAPE available to the
> child.  If the parent makes clear his or her intention to keep the child enrolled in
> the private [school] located in another LEA, the LEA where the child resides need
> not make FAPE available to the child.

*Assistance to States for the Education of Children With Disabilities and Preschool Grants for*

*Children With Disabilities*, 71 Fed. Reg. 46540, 46593 (Aug. 14, 2006).

      The IHO acknowledged that the mother had testified that the parents' intent to place E.T.

at Ridge was not yet definite at the time she made that statement.  (IHO Dec. at 19; Tr. at 515-

16.)  But the IHO determined otherwise, noting that the parents failed to mention to Mannino or

anyone else at Pine Bush that Hyde Park's CSE had met on June 7, 2010, despite continuous

communication with Mannino since May 18, 2010.  (IHO Dec. at 19-20.)  Notably, the IHO also

stated that the parents' assertions of unavailability with respect to the selected dates for the CSE

hearing in Pine Bush were "disingenuous and deliberately designed to obstruct the CSE process."

(*Id.* at 20.)

---

[9] The IHO found that the district had argued before him that "the District was not obligated to develop an IEP for
[E.T.] because [Ridge] is located in the Hyde Park School District and the parents advised [Hyde Park] of their
intention to enroll [E.T.] at [Ridge] for the 2010-2011 school year."  (IHO Dec. at 5.)  Indeed, in his opening
statement, counsel for the district stated

> By all accounts [E.T.] and his parents are happy at Ridge and his parents have clearly signified
> their intent that he continue to remain in that setting.
>
> . . .
>
> [T]he parents never really intended for [E.T.] to go to any placement but [Ridge] where they
> placed him several years ago as long as it was financed by Pine Bush.  Therefore, we will argue
> and we will show that tuition reimbursement will not be an available remedy for the parents.

(Tr. at 6, 7-8.)

### B.  The SRO's Decision of April 11, 2011

The parents timely filed an appeal to an SRO.[10]  The parents contended on appeal that the IHO erroneously determined that the district was not obligated to provide a FAPE to E.T. (SRO Dec. at 17.)  Instead, according to the parents, the appropriate determination was whether or not the district had, in fact, provided E.T. with a FAPE.  (*Id*.)  The parents argued that the district had not raised the claim that it had no such obligation during the impartial hearing, but rather had vigorously maintained that it offered the child a FAPE.  (*Id*.)

On April 11, 2011, SRO Justyn P. Bates affirmed the IHO's decision in its entirety and dismissed the parents' appeal.  (*Id*. at 20.) The SRO acknowledged that the party requesting an impartial hearing determines the issues to be addressed before the IHO, and that the IHO was required to disclose any intention to reach an issue that the parties have not themselves raised. (*Id*. at 17.)  However, the SRO found the record to be "replete with testimonial and documentary evidence regarding the parents' decision to privately place the student at Ridge . . . and the district of residence's responsibility to offer the student a FAPE."  (*Id*.)   Thus, the SRO concluded that the issue of whether or not the district was obligated to provide E.T. with a FAPE was properly before the IHO.  (*Id*. at 18.)

Accordingly, the SRO went on to examine whether the district was so obligated.  Citing the same DOE guidance on which the IHO had relied—as well as literature generated by the Department of Education of the State of New York[11] that interprets the provision—the SRO

---

[10] Either the parents or the school district may appeal an IHO's determination to an SRO, who is appointed by the State Education Department.  20 U.S.C. §1415(g); N.Y. Educ. Law §4404(2).

[11] Memorandum from James P. DeLorenzo, Office of Vocational and Educational Services for Individuals with Disabilities, The State Education Department, to District Superintendents *et al*., *Chapter 378 of the Laws of 2007 - Guidance on Parentally Placed Nonpublic Elementary and Secondary School Students with Disabilities Pursuant to the Individuals with Disabilities Education Act (IDEA) 2004 and New York State (NYS) Education Law Section 3602-c* (Sept. 2007), *available at* http://www.p12.nysed.gov/specialed/publications/policy/nonpublic907.pdf.

found that the parents had sufficiently expressed their intent to privately place the child at Ridge

for the 2010-2011 school year, thus eliminating any obligation the district had to provide E.T.

with a FAPE.  (*Id.* at 19.)  The SRO further stated "neither the IDEA nor State law preclude a

parent from meeting with CSEs from both a district of location and a district of residence to

develop and IESP or an IEP for their consideration," as the parents had done here.  (*Id.* n.16.)

However, the SRO noted that "the IDEA and State law also do not require both public school

districts to *simultaneously provide* services under both schemes."  (*Id.*)  He then stated:

> [T]he hearing record supports the [IHO's] finding that the parents expressed their
> intent to privately place the student at Ridge for the 2010-11 school year, [as] it
> appears that the parent first sought to parentally enroll the student under the State
> law dual enrollment statute to obtain public school services recommended by the
> CSE from one district—the district of location—without challenging the IESP as
> inappropriate and, thereafter, the parents again sought to obtain services . . .
> through the CSE of the other public school in this case—the district of residence.

(*Id.* at 19.)  Because the parents expressed their intent to place the child at Ridge and "consistent

with both the Office of Special Education [of the State of New York] guidance memorandum

and federal guidance," the SRO concluded that the district was not required to make a FAPE

available to E.T.  (*Id.* at 20.)  Thus, the SRO affirmed the IHO's decision and denied the parents'

request for tuition reimbursement from the district.  (*Id.*)

The instant appeal followed.[12]

## III.    IDEA Statutory Framework

### A.  Free Appropriate Public Education Requirement

Any state receiving federal funding pursuant to the IDEA must provide a free appropriate

public education ("FAPE") to disabled children, which must be tailored to the unique needs of

---

[12] Any party "aggrieved" by the SRO's findings may bring a civil action in state or federal court.  20 U.S.C.
§1415(i)(2)(A).

each child by way of an IEP.[13]   20 U.S.C. § 1412(a)(1)(A), (a)(4); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181 (1982).   An IEP must be "reasonably calculated to enable the child to receive educational benefits," *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (quoting *Rowley*, 458 U.S. at 207), "likely to produce progress, not regression,'" and afford the student with an opportunity greater than mere "trivial advancement." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 130 (2d Cir. 1998)). The IEP is thus considered the "central mechanism by which public schools ensure that their disabled students receive a [FAPE]."   *Polera v. Bd. Of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 482 (2d Cir. 2002).   Because New York State receives federal funds under the IDEA, it must comply with the requirements of this statute.   *Walczak*, 142 F.3d at 123.   The IEP in New York must be produced by a CSE, whose members are appointed by the board of education or trustees of the school district. *Id.* (citing N.Y. Educ. Law § 4402(1)(b)(1); *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 152 (2d Cir. 1992)).

### B.  Equitable Participation Requirement

The IDEA contains a separate framework for disabled children who are parentally-placed in private schools, which requires states to "allocate a proportional share of federal IDEA funds to provide special education and related services to parentally-placed private school children." *J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 665 (S.D.N.Y. 2011) (citing 20 U.S.C. § 1412(a)(10)(A)(i)-(ii); 34 C.F.R. §§ 300.131-300.133).   "Because the federal funds received by a state under the IDEA are only a fraction of the cost of educating a state's disabled

---

[13] An IEP is a written statement, collaboratively developed by the parents, educators, and specialists, that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honing v. Doe*, 484 U.S. 305, 311 (1988).

children, children choosing to attend private school  . . . [are] entitled as a group to only a proportionate amount of that fraction." *Russman v. Bd. of Educ. of City of Watervliet*, 150 F.3d 219, 221 (2d Cir. 1998) (internal citation omitted).    States are thus "not obligated under the statute to expend their *own* funds on disabled children who have voluntarily enrolled in private school.  Rather, states are required to provide [them] only those services that can be purchased with a proportionate amount of the federal funds received under the program."  *Id.* at 221 (collecting cases) (emphasis added).

Disabled children whose parents opt to place them in private school may therefore receive a different amount of services under the IDEA than those who remain in public schools. 34 C.F.R. §§ 300.137, 300.138.   "The more limited services provided to parentally-placed children in private schools is commonly known as 'equitable participation,'" and is distinct from the FAPE requirement.  *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1066 (D.N.J. 2011) (citing 20 U.S.C. § 1412(a)(10)(A)(ii)(II)).   Equitable participation entitles disabled children who are parentally placed in private schools to certain services, which may be provided at the private school.  *Id.* § 1412(a)(10)(A); 34 C.F.R. §§ 300.137-139.  Equitable participation must also entail a "plan that describes the specific special education and related services that the LEA [of location] will provide to the child."  34 C.F.R. §§ 300.137(c), 300.138(b).  In New York, this plan is known as an Individualized Education Service Program, i.e., the IESP.  N.Y. Educ. Law §3602-c(2)(b).

### C.  Child Find Obligation

In addition to fulfilling the FAPE and equitable participation requirements, the IDEA provides that any state receiving federal funding must also have policies and procedures in place to identify, locate, and evaluate all disabled children residing in the state who are in need of

special education and related services.  20 U.S.C. § 1412(a)(3)(A).  This is known as the "child find" obligation, *id.*, which applies to all disabled children in need of special education, regardless of whether they are enrolled in public or private schools.  *Id.* § 1412(a)(10)(A)(ii)(I), 34 C.F.R. § 300.131(a).  The extension of the child find obligation to private school students with disabilities is intended "to ensure the equitable participation[14] of parentally placed private school children with disabilities and an accurate count of such children."  20 U.S.C. § 1412(a)(10)(A)(ii)(II); 34 C.F.R. § 300.131(b).[15]  Accordingly, a school district may have a child find obligation for students who attend a school within the district but who reside in another school district or another state.  34 C.F.R. § 300.131(a), (f).

Courts in this district and others interpret the child find obligation as "distinct from the requirement of an LEA to provide FAPE to its residents" and recognize that the IDEA does not necessarily relieve a district of residence of its responsibility to provide a FAPE to disabled children who attend a school in another jurisdiction.  *Dist. of Columbia v. Abramson*, 493 F. Supp. 2d 80, 85, 86 (D.D.C. 2007).  Simply because a school district "may have child find responsibilities of its own" as to a disabled child enrolled in a non-public school within the district "does not relieve [the district of residence of the same child] from having to fulfill its own responsibilities . . . to evaluate the student and make FAPE available."  *Id.* at 86 (citing *Ms. K. v. Maine Sch. Admin. Dist. No. 40*, Civ. 06-42-P-H, 2006 WL 3081555, at *14 (D. Me. Oct. 26, 2006)).

---

[14] *See supra* Part III.B.

[15] In addition to identifying, locating, and evaluating all disabled children in the state, the child find obligation further requires states to develop and implement "a practical method . . . to determine which children with disabilities are currently receiving needed special education and related services" in order to be eligible for IDEA funding.  20 U.S.C. § 1412(a)(3)(A).

### IV.     Applicable Legal Standards

#### A.  Tuition Reimbursement Under the IDEA

If the parents of a disabled child believe that the school district has failed to provide the child with a FAPE as required under the IDEA, they are permitted to place the child in a private school—at their own financial risk, *Gagliardo*, 489 F.3d at 111—and then seek tuition reimbursement from the school district.  *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 237-38 (2009) (citing *Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 369 (1985)); *A.C. ex rel M.C. v. Bd. of Educ. Of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009); *Mr. & Mrs. A. ex rel. D.A. v. New York City Dep't of Educ.*, 769 F. Supp. 2d 403, 407 (S.D.N.Y. 2011).  The parents may challenge their child's IEP first by requesting an impartial due process hearing, held before an IHO appointed by the local school district, whose decision may, in turn, be appealed to an SRO appointed by the New York State Department of Education.  20 U.S.C. § 1415(f), (g); N.Y. Educ. Law § 4404(1), (2).  Any party "aggrieved" by the SRO's decision may then challenge the decision in either state or federal court.  20 U.S.C. § 1415(i)(2)(A).

On appeal, a federal district court must examine three distinct issues to determine whether the parents are entitled to tuition reimbursement for the placement of their child in private school.  *See Forest Grove*, 557 U.S. at 246-47 (citing *Florence Cnty. Sch. Dist. Four v. Carter,* 510 U.S. 7, 15 (1993)).  In considering the parents' tuition reimbursement request, the court must ask:  (1) whether the school district has failed to provide a FAPE; (2) whether the parental placement in a private school is appropriate; and (3) whether the equities warrant reimbursement, be it partial or in full. *D.A.*, 769 F. Supp. 2d at 408 (quoting *Forest Grove*, 557 U.S. at 246-47).  This is referred to as the "*Burlington/Carter* test."

The first *Burlington/Carter* inquiry requires a court to analyze two separate elements. *See M.H. v. N.Y.C. Dep't. of Educ.*, 685 F.3d 217, 245 (2d Cir. 2012). First, the court must ask whether the state complied with the procedures required by the IDEA, *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003); and second, the court must determine whether the IEP was reasonably calculated in substance to enable the child to receive educational benefits. *Id.*, 346 F.3d at 381 (quoting *Rowley*, 458 U.S. at 206-07). If the IEP is deemed inadequate based on procedural or substantive grounds, the court must next determine whether the parents' chosen placement for the child is "reasonably calculated" to confer educational benefits.[16] *M.H.*, 685 F.3d at 246 (quoting *Gagliardo*, 489 F.3d at 112); *Frank G.*, 459 F.3d at 364. "The party who commences an impartial hearing—in this case, the parents—bears the burden of persuasion on [the first two *Burlington/Carter*] factors." *Gagliardo*, 489 F.3d at 112 (citing *Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005)).

Third, if the IEP is found to be inadequate and the parental placement is deemed appropriate, then the court must make the third *Burlington/Carter* inquiry and determine, based upon equitable factors, whether the parents are entitled to tuition reimbursement. *Carter,* 510 U.S. at 15-16 (1993); *Gagliardo*, 489 F.3d at 112. "[E]quitable considerations relating to the reasonableness of the action taken by the parents are relevant" to this analysis. *M.H.*, 685 F.3d at 245 (quoting *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009)). For instance, tuition reimbursement may be reduced or denied if the parents failed to timely notify the school district of their intent to place the child in a private school at the school district's expense. *See Frank G.*, 459 F.3d at 376.

---

[16] However, "parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education," *Frank G. v Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (citing 20 U.S.C. § 1401(9)), nor are they barred from reimbursement if the private placement does not meet state education standards or requirements. *Id.* (citing *Carter*, 510 U.S. at 14.)

### B.  Standard of Review

Upon an aggrieved party's appeal of the SRO's decision to the federal district court, the court must review the entirety of the administrative record in addition to supplemental evidence upon either party's request.  20 U.S.C. § 1415(i)(2)(c).  Though IDEA appeals tend to come before the district court as motions for summary judgment, *see Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003), the existence of a genuine issue of material fact does not necessarily result in denial of the motion.  *J.R. v. Bd. of Educ. of the City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004).  Rather, a motion for summary judgment in the IDEA context is more akin to an appeal from an administrative determination.  *M.H.*, 685 F.3d at 226 (quoting *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

Although the rulings of the IHO and the SRO are subject to "independent" judicial review, *Walczak*, 142 F.3d at 130, a federal court's role in reviewing state educational decisions under the IDEA is "circumscribed," as the judiciary "generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Gagliardo*, 489 F.3d at 112 (quoting *Rowley*, 458 U.S. at 208) (internal quotation marks omitted).[17]  Upon independently reviewing the administrative record, the court must make a determination based upon a preponderance of the evidence, which "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  *Rowley*, 458 U.S. at 206; *Gagliardo*, 489 F.3d at 112-13. Rather, the federal courts must accord "substantial deference" to such findings.  *Cerra*, 427 F.3d at 191.

---

[17] This standard of review has been characterized as "modified *de novo*."  *M.R. v. S. Orangetown Cent. Sch. Dist.*, 10 Civ. 1800 (CS), 2011 WL 6307563, at *6 (S.D.N.Y. Dec. 16, 2011).

Furthermore, district courts should abstain from making subjective credibility assessments. *M.H.*, 685 F.3d at 240 (quoting *Grim*, 346 F.3d at 383).

As the Second Circuit has recently articulated, the district court's analysis of the administrative findings below must "hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantial greater familiarity with the evidence and the witnesses than the reviewing court." *M.H.*, 685 F.3d at 244. That being said, the court's conception of whether the administrative findings are persuasive "must also be colored by an acute awareness of institutional competence and role . . . [and] courts are required to remain conscious of these considerations in determining the weight due any particular administrative finding." *Id.* District courts should afford particular deference to administrative findings as to the substantive adequacy of an IEP, *id.* (citing *Cerra*, 427 F.3d at 195), and to any "determinations grounded in thorough and logical reasoning." *Id.*

### V.   Discussion

#### A.   The District Retained an Obligation to E.T. Under the IDEA.

As discussed above, the IDEA separately addresses a state's obligations to disabled children who are parentally placed in private schools. 20 U.S.C. 1412(a)(10). The IDEA states, in pertinent part, that it

> does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

20 U.S.C. § 1412 (a)(10)(C)(i). Though it may seem that this provision entirely divests a district of residence of its IDEA responsibilities once a parent unilaterally enrolls a child in an out-of-district placement, courts in this district and in others have disagreed with such an interpretation.

*J.S.*, 826 F. Supp. 2d at 665 (stating that when parents have placed their child in a private school and seek a FAPE from the district in which they continue to reside, the "district-of-residence's obligations do not simply end because a child has been privately placed elsewhere") (collecting cases).

Courts have, in fact, affirmatively recognized that two school districts may have IDEA obligations to the same disabled child.[18]   *Abramson*, 493 F. Supp. 2d at 85-86.  In *Abramson*, the court affirmed the administrative officer's finding that even if the district of location engages in the child find process, the parents still retain a right to initiate a request for an evaluation from the district of residence, and the district of residence remains obligated to provide one. *Id.* Nothing in the language of the IDEA divests a district of residence of its FAPE obligations "simply by virtue of a parental placement at an out-of-district, but in-state, private . . . school." *Ms. K.*, 2006 WL 3081555, at *14.

Put another way, courts have recognized "that residency, rather than enrollment, triggers a district's FAPE obligations."  *S.D.*, 811 F. Supp. 2d at 1069; *see also J.S.*, 826 F. Supp. 2d at 668 (the parents were entitled to place their disabled child in a private school, even though the district of residence had not previously denied the child a FAPE, and subsequently seek a FAPE from the district of residence); *James ex rel. James v. Upper Arlington City Sch. Dist.*, 228 F.3d 764, 768 (6th Cir. 2000) ("the obligation to deal with a [disabled] child in need of services, and to prepare an IEP, derives from residence in the district, not from enrollment"); *Abramson*, 493

---

[18] The DOE has also recognized that it is permissible for parents to request that their child be evaluated by more than one school district if "the child is attending a private school that is not in the LEA in which they reside."  71 Fed. Reg. at 46593.  For instance, if the parents of a disabled child reside within one LEA but the child attends a private school within another, the parents would be entitled to have the child evaluated for FAPE purposes in the district of residence, and have the child evaluated for equitable services in the district of location.  *Id.*  Because federal regulations require parental consent for the release of information about parentally-placed private school children from one school district to another, one LEA may not know that a parent also requested an evaluation from another LEA if the parent has not made such information available.  *Id.*; 34 C.F.R. § 300.622(a)(3).

F. Supp. 2d at 80 (finding that simply because another school district had "child find responsibilities of its own," where a child was enrolled in an out-of-state private school, the district of residence still had to "fulfill its own responsibilities as the LEA of residence to evaluate the student and make FAPE available"); *Ms. K*, 2006 WL 3081555 at *14 (the court struck down the school district's interpretation of the IDEA that only the school district within which a private school was located—and not the district within which the child resided—was charged with IDEA obligations to a disabled child placed in that private school).

    As these cases make clear, the circumstances presented in the instant matter are not unique. Courts have repeatedly found that the IDEA does not give a district of residence "carte blanche to cut [a disabled child] loose, without any duty to even assist in the transfer of his IEP to [another] district," when the parents elect to place that child in a private school within another district. *Ms. K*, 2006 WL 3081555 at *14, n.5. The pertinent provisions of the IDEA "are obviously designed to require states to prevent parentally placed students from falling through the cracks and losing the federal funded special education services [to which] they are entitled," *id.*, which is why—under these circumstances—a district of residence's FAPE obligation does not disappear when parents unilaterally place their children elsewhere. Therefore, although E.T.'s parents had requested services from Hyde Park—the district of location—and ostensibly had enrolled him at Ridge for the 2010-2011 school year, Pine Bush—the district of residence— nevertheless remained obligated to provide E.T. a FAPE.

### A. The Parents' Intent to Enroll E.T. at Ridge Did Not Divest the District of its FAPE Obligation to E.T.

The above-cited case law, however, does not explicitly consider the issue of the parents' intent.[19]  In support of its position that the parents' intent to place E.T. at Ridge divested the district of its FAPE obligation to E.T., the district relies on the DOE's guidance that interprets its regulations, 34 C.F.R. § 300.200 *et seq.*, which states, in pertinent part, that

> if a determination is made by the LEA where the private school is located that a child needs special education and related services, the LEA where the child resides is responsible for making FAPE available to the child.  *If the parent makes clear his or her intention to keep the child enrolled in the private [school] located in another LEA, the LEA where the child resides need not make FAPE available to the child.*

71 Fed. Reg. at 46593 (emphasis added).  This language suggests that the district had no obligation to E.T. under the IDEA due to his parents' clear intent to place him at Ridge.  Indeed, the IHO and the SRO found it to be determinative.  While it is true that a court must accord "deference [to an administrative agency] when it adopts a reasonable interpretation of regulations it has put in force . . . unless it is plainly erroneous or inconsistent with the regulation," *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 397 (2008) (citations and quotation marks omitted), the inquiry cannot end at that juncture.

This is so because under *Burlington/Carter*, the issue of parental intent vis-à-vis the child's enrollment is not dispositive of whether a school district has a FAPE obligation to a disabled child.  Rather, it is only after a court concludes that the school district failed to provide a FAPE and that the parents' chosen placement for the child was appropriate that it can determine, based upon equitable considerations, whether reimbursement for some or all of the cost of the child's private education is warranted.  *Forest Grove,* 557 U.S. at 247.   Upon consideration of

---

[19] Despite Plaintiff's contention that "the school district did not argue [below] that it had no responsibility to offer FAPE," (Pl.'s Mem. at 11), there is evidence in the record indicating otherwise.  (Mem. Law Opp. Pet'r's Appeal 9-11; SRO Dec. at 17-18); *see supra* n.9.

any relevant equitable factors—such as the reasonableness of the parents' behavior, for example—a court may diminish or eliminate the right to tuition reimbursement.[20]  *See supra* Part IV.A.

As other courts have found, the issue of the parents' intent is a question that informs the balancing of the equities rather than whether the district had an obligation to the child under the IDEA. *Forest Grove*, 557 U.S. at 247 (where the fact that "parents failed to give the school district adequate notice of their intent to enroll the child in private school" was an equitable factor); *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 72 (3d Cir. 2010) (same); *see also Frank G.*, 459 F.3d at 376 (stating that it would be "inequitable" to permit reimbursement if parents behaved unreasonably regarding the IDEA process).  Thus, whether the parents made clear their "intention to keep the child enrolled in the private [school] located in another LEA" would be relevant to the balancing of equitable considerations.  71 Fed. Reg. 46593; *see J.S.*, 826 F. Supp. 2d at 673 (where court considered as an equitable factor that the parents had committed child to enrollment at private school before district made its FAPE proposal) (citing *S.W. v. N.Y.C. Dep't. of Educ.*, 646 F. Supp. 2d 346, 364 (S.D.N.Y. 2009) (same); *Bettinger v. N.Y.C. Bd. of Educ.*, 06 Civ. 6889 (PAC), 2007 WL 4208560, at *7-8 (S.D.N.Y. Nov. 20, 2007) (same)).

The IHO and the SRO both concluded that the district had no obligation to provide a FAPE to E.T. based upon the DOE guidance, but neither reviewing officer addressed whether the

---

[20] In addition to the Court's broad discretion in considering whether reimbursement is warranted, *Carter*, 510 U.S. at 16 (quoting *Burlington*, 471 U.S. at 369), the IDEA enumerates specific instances in which reimbursement may be reduced or denied, such as if the parents did not inform the district of their rejection of the district's proposed placement at the most recent IEP meeting prior to the child's removal from the district, "including stating their concerns and their intent to enroll their child in a private school at public expense;" if the parents failed to give written notice to the district 10 business days prior to the child's removal from the district; or upon a "judicial finding of unreasonableness with respect to actions taken by the parents."  20 U.S.C. § 1412 (a)(10)(C)(iii).  "The Supreme Court has suggested that the statutory factors are a non-exhaustive list." *J.S.*, 826 F. Supp. 2d at 671 (citing *Forest Grove*, 557 U.S. at 242 ("The clauses of § 1412(a)(10)(C) are . . . best read as elucidative rather than exhaustive."))

district, in fact, offered E.T. a FAPE, whether the parental placement at Ridge was appropriate, or whether equitable factors effectively precluded tuition reimbursement. While this Court enjoys "broad discretion" in reviewing equitable considerations, *Burlington,* 471 U.S. at 369, the same is not true as to matters of educational policy. *Rowley*, 458 U.S. at 206. Based on the state of the record, this Court is not able to make findings on those threshold issues, and is not free to simply skip over the first two *Burlington/Carter* inquiries prior to making the equitable determination.[21] For this reason, the Court remands this case to the SRO. *See Maine Sch. Admin. Dist. No. 35 v. Mr. R.*, 321 F.3d 9, 20 (1st Cir. 2003) ("If the district court does not believe that the record is sufficient to permit it to make the highly nuanced judgments necessary to resolve the claim for compensatory education, it may remand the matter for further administrative adjudication.")

The SRO erred in concluding that the DOE guidance was dispositive of the district's IDEA obligation to E.T., and his decision must be vacated. On remand, the following issues must be addressed: (1) whether the district provided a FAPE to E.T. for the 2010-2011 school year; (2) if it did not, whether the parents' chosen placement at Ridge was appropriate for E.T.; and (3) even if the parents' placement was appropriate, if equitable considerations warrant tuition reimbursement.

---

[21] For instance, if the reviewing officers had found that the district did not make a FAPE available to E.T. and that Ridge was an appropriate placement for him, the Court might well find that the parents are entitled to tuition reimbursement, albeit reduced due to equitable considerations—namely, their unequivocal intent to place E.T. at Ridge even before the July 8, 2010 CSE meeting was convened. However, if the reviewing officers had found that a FAPE was made available to E.T., the issue of parental intent might be moot. Likewise, if the reviewing officers had found that Ridge was an inappropriate placement for E.T., the Court would not need to consider equitable factors, as reimbursement would be improper.

## VI.    Conclusion

For the reasons stated above, this action is hereby STAYED and REMANDED to the State Review Officer for further proceedings as outlined above.  Plaintiffs' motion for summary judgment is DENIED without prejudice and Defendant's cross-motion for summary judgment is likewise DENIED without prejudice.  The Clerk of the Court is directed to terminate the motions (Docs. 7, 11).


It is SO ORDERED.

Dated:    November 26, 2012
          White Plains, New York

                                                    _____
                                                    Edgardo Ramos, U.S.D.J.